**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| JACQUELINE TAPIA, ANGELA ALAVEZ, ISABELLA CASANOVA, GREGORY GARDNER, JOAN VISINTAINER, VINCENT CIPOLLA, RAYMOND PETTUS, KIMBERLY COVINGTON-BERNAL, CAROLYN PRESLEY, ELISE BELL and HEATHER WATKINS, individually and on behalf of all others similarly situated, | Case No.: 4:25-cv-00626-JMD **FIRST AMENDED CLASS ACTION COMPLAINT** JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| ASCENSION HEALTH, | |
| Defendant. | |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Jacqueline Tapia, Angela Alavez, Isabella Casanova, Gregory Gardner, Joan Visintainer, Vincent Cipolla, Raymond Pettus, Kimberly Covington-Bernal, Carolyn Presley, Elise Bell and Heather Watkins (collectively, "Plaintiffs") bring this First Amended Consolidated Class Action Complaint against Ascension Health ("Ascension" or "Defendant"), individually and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

**SUMMARY OF ACTION**

1.      Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard sensitive information of its patients for the **second time in less than 8 months**. The first data breach was a ransomware attack in May 2024. The second data breach that is the subject of the instant lawsuit was a cyberattack that occurred in December 2024 after Defendant wrongfully disclosed the sensitive information to its former business partner and it was stolen by

cyberthieves (the "Data Breach").

2.      According to the notification letters sent by Defendant, the data affected included widespread categories of personally identifiable information ("PII") and protected health information ("PHI", and collectively with PII, "PII/PHI"), including names, addresses, phone numbers, email addresses, dates of birth, race, gender, clinical information, places of service, physicians' names, diagnoses, billing codes, medical record numbers, insurance information, and more.

3.      As a result of Ascension's inadequate security and breach of its duties and obligations, the Data Breach occurred, and at least 437,329 individuals' PII/PHI was stolen.

4.      The PII/PHI compromised in the Data Breach was targeted and then exfiltrated by cybercriminals because of its high value to identity thieves and remains in the hands of those cybercriminals.

5.      As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

**INTRODUCTION**

6.      Ascension is a healthcare provider headquartered in St. Louis, Missouri, with locations in several other states.

7.      On or about December 5, 2024, Ascension discovered that patient information was involved in a security incident in which an unauthorized third party gained access to one of Ascension's third-party vendor's network systems and acquired files containing the PII/PHI of Ascension's patients, including Plaintiff and Class members (the "Data Breach").

8.      Ascension owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Ascension breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its patients' PII/PHI from unauthorized access and disclosure.

9.      This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach, which Ascension discovered on or about December 5, 2024.

10.      Plaintiffs, on behalf of themselves and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

**PARTIES**

11.      Jacqueline Tapia is and at all relevant times was a citizen and resident of Indiana, where she intends to remain.

12.      Angela Alavez is and at all relevant times was a citizen and resident of Michigan,

where she intends to remain.

13.     Isabella Casanova is and at all relevant times was a citizen and resident of Indiana, where she intends to remain.

14.     Gregory Gardner is and at all relevant times was a citizen and resident of Tennessee, where he intends to remain.

15.     Joan Visintainer is and at all relevant times was a citizen and resident of Wisconsin, where she intends to remain.

16.     Vincent Cipolla is and at all relevant times was a citizen and resident of Indiana, where he intends to remain.

17.     Raymond Pettus is and at all relevant times was a citizen and resident of Indiana, where he intends to remain.

18.     Kimberly Covington-Bernal is and at all relevant times was a citizen and resident of Indiana, where she intends to remain.

19.     Carolyn Presley is and at all relevant times was a citizen and resident of Alabama, where she intends to remain.

20.     Elise Bell is and at all relevant times was a citizen and resident of Indiana, where she intends to remain.

21.     Plaintiff Heather Watkins is and at all relevant times was a citizen and resident of Tennessee, where she intends to remain.

***Defendant Ascension Health***

22.     Defendant Ascension Health is a Missouri nonprofit corporation with its principal place of business located at 4600 Edmundson Rd., Saint Louis, MO 63134.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C.

§ 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is

a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy

exceeds $5,000,000, exclusive of interest and costs.

24.     This Court has general personal jurisdiction over Ascension because it is organized

under the laws of this State and maintains its principal place of business in this District.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Ascension's

principal place of business is in this District and a substantial part of the events, acts, and omissions

giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

*Overview of Ascension*

26.     Ascension is a healthcare provider with locations in 16 states including Florida,

Illinois, Indiana, Kansas, Maryland, Michigan, Oklahoma, Tennessee, Texas, and Wisconsin.[1]

Ascension has approximately 26,000 affiliated providers, 106,000 associates, and operates 105

hospitals.[2] It offers a wide range of healthcare services, including cancer, cardiology, neurology,

and orthopedic care.[3]

27.     In the regular course of its business, Ascension collects and maintains the PII/PHI

of its patients, including Plaintiff and Class members. Ascension requires patients to provide it

with their PII/PHI, including the PII/PHI that was stolen in the Data Breach, before it provides

---

[1]    *Compassionate care when and where you need it*, ASCENSION HEALTH, https://healthcare.ascension.org/ (last accessed May 14, 2025).
[2] *Id.*
[3]    *Specialty Care*, ASCENSION HEALTH, https://healthcare.ascension.org/specialty-care (last accessed May 14, 2025).

them healthcare services.

28.     Plaintiffs and Class members are current or former patients of Ascension who entrusted their PII/PHI to Ascension in exchange for healthcare services.

29.     On its website, Ascension promises it develops relationships "based on honesty, fairness and mutual trust."[4] Ascension also promises it "will operate in accordance with all laws and regulations applicable to Ascension."[5] Ascension admits it is required to "[m]aintain [the] privacy and security of protected health information in keeping with HIPAA."[6]

30.     Ascension further promises its associates "are expected to: maintain the confidentiality of all organization information; access, use and disclose confidential and proprietary information only for which they are authorized; keep confidential and proprietary information secure when not using the information; and refrain from discussing confidential and proprietary information with unauthorized personnel or outside sources."[7] Ascension also states associates will "not disclose confidential information related to Ascension to any outside unauthorized person or organization."[8]

31.     Ascension's website contains Notices of Privacy Practices (the "Privacy Policy") for each state in which it has locations,[9] which are substantively identical.[10] The Privacy Policy

---

[4] *Ascension Standards of Conduct*, ASCENSION HEALTH (July 2023), https://about.ascension.org/-/media/project/ascension/about/section-about/ascension-compliance-program.pdf.
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Notice of Privacy Practices*, ASCENSION HEALTH, https://healthcare.ascension.org/npp (last accessed May 14, 2025).
[10] *Compare Ascension Michigan Joint Notice of Privacy Practices*, ASCENSION HEALTH (Jan. 1, 2023), https://healthcare.ascension.org/-/media/healthcare/npp/michigan/mi_ascension-michigan_english.pdf (covering all "Ascension health care providers located in Michigan"), *with Ascension Saint Thomas Joint Notice of Privacy Practices*, ASCENSION HEALTH (Jan. 1, 2023),

describes the different ways Ascension may use and disclose patients' health information, including "for treatment, payment, and health care operations purposes."[11]

32.     Ascension promises its patients that "[a]ll of our business associates are required to protect the privacy and security of your health information just as we do."[12] Ascension promises patients it will "make reasonable efforts to limit" incidental disclosures of PII/PHI."[13]

33.     Ascension also promises that it will only share PII/PHI for "any other reasons not described in" the Privacy Policy only with a patient's written permission.[14] It further promises patients it "will not use or share your information other than as described here unless you tell us we can in writing."[15]

34.     Ascension admits in the Privacy Policy that its "use and disclosure of certain sensitive information may also be further restricted by other federal or state laws."[16] It also admits it is "required by law to maintain the privacy and security of your health information."[17]

35.     Ascension states it will notify patients "if a breach occurs that may have compromised the privacy or security of your identifiable health information."[18]

36.     In the Privacy Policy, Ascension tells its patients it will "follow the practices described in this Notice and provide you a copy of it."[19]

---

https://healthcare.ascension.org/-/media/healthcare/npp/tennessee/tn_ascension-saint-thomas_english.pdf (covering all "Ascension health care providers located in Tennessee").

[11] *E.g.*, *Ascension Saint Thomas Joint Notice of Privacy Practices*, *supra* note 10.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

*The Data Breach*

37.    In Defendant's Notice Letters to Plaintiffs and Class Members dated April 28,

2025, Ascension informed them that:

> **What Happened?** On December 5, 2024, we learned that Ascension patient
> information may have been involved in a potential security incident. We
> immediately initiated an investigation to determine whether and how a security
> incident occurred. Our investigation determined on January 21, 2025, that
> Ascension inadvertently disclosed information to a former business partner, and
> some of this information was likely stolen from them due to a vulnerability in third-
> party software used by the former business partner. We have since reviewed our
> processes and are working to implement enhanced measures to prevent similar
> incidents from occurring in the future.

> **What Information Was Involved?** Our investigation determined that the personal
> information involved in this incident included demographic information, such as
> your name, address, phone number(s), e-mail address, date of birth, race, gender,
> and Social Security number (SSN), as well as clinical information related to an
> inpatient visit, such as place of service, physician name, admission and discharge
> dates, diagnosis and billing codes, medical record number, and insurance company
> name.  The exact type of information involved depends on the individual.

38.    Ascension disclosed that the Data Breach affected patient information from

"Ascension locations in Alabama, Michigan, Indiana, Tennessee, and Texas."[20]

39.    But Ascension's notice amounts to no real disclosure at all, as it fails to inform,

with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts.

Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from

the Data Breach is severely diminished.

40.    Omitted from the Notice Letter were the date(s) of the Data Breach, the identity of

the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data

Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a

breach does not occur again. To date, these omitted details have not been explained or clarified to

---

[20] *Id.*

Plaintiffs and Class Members, who retain a vested interest in ensuring that their PII/PHI remains protected, especially since this was the ***second*** breach Ascension experienced in 2024.

41.     While Ascension learned of the Data Breach on or about December 5, 2024, and learned Ascension patient information was affected by approximately January 21, 2025, Ascension waited until approximately April 28, 2025—well over four months after first learning of the Data Breach—to begin notifying its patients that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[21] Ascension still has not informed Plaintiff and Class members of the date the Data Breach occurred, the identity of the "former business partner" it disclosed their PII/PHI to or the third-party software their PII/PHI was stolen from.[22]

42.     Ascension's failure to promptly notify Plaintiffs and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited the security failures could monetize, misuse, and disseminate that PII/PHI before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (and already have been) stolen and misappropriated.

***Data Breaches Are Preventable***

43.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII/PHI, such as encrypting the information or deleting it when it is no longer needed.

44.     Defendant could have prevented this Data Breach by, among other things, properly

---

[21] *See id.*
[22] *Id.*

9

encrypting or otherwise protecting their equipment and computer files containing PII/PHI.

45.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[23]

46.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs

---

[23] Fed. Bureau of Investigations, *How to Protect Your Networks from RANSOMWARE*, at 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[24]

47.    To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**

-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-    Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-    Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-    Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-    Monitor for adversarial activities
-    Hunt for brute force attempts

---

[24] *Id.* at 3–4.

- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[25]

48.     Given that Defendant was storing the PII/PHI of its current and former patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

49.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the PII/PHI of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members

*Ascension Knew that Criminals Target PII/PHI*

50.     At all relevant times, Ascension knew, or should have known, that the PII/PHI that it collected, shared, and stored was a target for malicious actors. Indeed, Ascension has experienced several other recent data breaches and security incidents.[26] Further, Ascension states in its Privacy Policy that it will alert patients in the event of a breach of their PII/PHI. Despite such knowledge, Ascension failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized disclosures and cyberattacks that it should have anticipated and guarded against.

---

[25] *See* Microsoft, *Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.
[26] *Public Notices*, *supra* note **Error! Bookmark not defined.**.

51.     It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[27]

52.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023),  Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

53.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[28] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[29]

54.     PII/PHI is a valuable property right.[30] The value of PII/PHI as a commodity is

---

[27] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[28] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed May 14, 2025).

[29] *See id*.

[30] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

measurable.[31] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[32] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[33] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

55.     As a result of the real and significant value of this data, identity thieves and other cyber criminals have publicly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

56.     As a healthcare entity that requires taking possession of its patients' PII/PHI, Defendant knew, or should have known, of the importance of safeguarding the PII/PHI entrusted to it by Plaintiffs and Class Members, and of the foreseeable consequences on its patients if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

***Defendant Breached Statutory Duties to Protect the PII/PHI***

57.     Defendant had obligations created by the Federal Trade Commission Act ("FTC

---

[31] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[32] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[33] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

Act"), HIPAA, contract, common law, and industry standards to keep Plaintiff's and Class Members' PII/PHI confidential and to protect it from unauthorized access and disclosure.

58.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[34]

59.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

60.    The FTC further recommends that companies not maintain PII/PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

61.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential patient data as an unfair

[34] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[35] *Id.*

act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

62.     These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (Henry Ford) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

63.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII/PHI. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

64.     Defendant failed to properly implement basic data security practices.

65.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII/PHI of its patients or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

66.     Upon information and belief, Ascension was at all times fully aware of its obligation to protect the PII/PHI of its patients, Ascension was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

67.     Defendant is also a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

68.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[36] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

69.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

70.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

71.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

72.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

73.     HIPAA's Security Rule requires Defendant to do the following:

      a.     Ensure the confidentiality, integrity, and availability of all electronic

---

[36] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.   Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.   Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.   Ensure compliance by its workforce.

74.   HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

75.   HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

76.   The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable

delay and ***in no case later than 60 days following discovery of the breach***."[37]

77.    HIPAA requires a covered entity to have and apply appropriate sanctions against patients of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

78.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

79.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e- and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[38] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-." US Department of Health & Human Services, Guidance on Risk Analysis.[39]

---

[37]    U.S.    Dep't    of    Health    &    Human    Services,    *Breach    Notification    Rule*, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

[38]    U.S.    Dep't    of    Health    &    Human    Servs.,    *Security    Rule    Guidance    Material*, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

[39]    U.S.    Dep't    of    Health    &    Human    Servs.,    *Guidance    on    Risk    Analysis*, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html.

*Defendant Failed to Comply with Industry Standards*

80.    As noted above, experts studying cyber security routinely identify healthcare entities in possession of PII/PHI as being particularly vulnerable to cyberattacks because of the value of the PII/PHI which they collect and maintain.

81.    Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of PII/PHI, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Ascension failed to follow these industry best practices, including a failure to implement multi-factor authentication.

82.    Other best cybersecurity practices that are standard for healthcare entities include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Ascension failed to follow these cybersecurity best practices, including failure to train staff.

83.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

84.     These foregoing frameworks are existing and applicable industry standards for healthcare entities, and upon information and belief, Defendant failed to comply with at least one– –or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

85.     Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[40] [41]

86.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[42]

87.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month

---

[40] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed May 14, 2025).

[41] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[42] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

to resolve issues stemming from identity theft.[43]

88.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[44] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[45] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[46] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[47]

89.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[48] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[49]

90.    In fact, cybercriminals now piece together bits and pieces of compromised or

---

[43] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed May 14, 2025).

[44] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[45] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 51.

[46] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed May 14, 2025).

[47] *Id*.

[48] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[49] *Id*.

unregulated PII/PHI to assemble "Fullz" packages, which are complete dossiers on individuals. With "Fullz" packages, the PII/PHI stolen in the Data Breach can easily be used to link and identify other private information of Plaintiffs and Class Members, such as credit card numbers and financial account information, even if that information was not part of the data exfiltrated in the Data Breach. Criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) and identity thieves in perpetuity.

91.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[50] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[51]

92.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[52] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what

---

[50] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[51] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[52] Steager, *supra* note 48.

you want them to do."[53]

93.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[54]

94.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

95.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

   a.    Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

   b.    Significant bills for medical goods and services neither sought nor received.

   c.    Issues with insurance, co-pays, and insurance caps.

   d.    Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

   e.    Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

   f.    As a result of improper and/or fraudulent medical debt reporting, victims may not

---

[53] *Id.*

[54] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [55]

96.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[56]

97.    It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black market.

***Damages Sustained by Plaintiffs and Class Members***

98.    Because of Defendant's failures to implement reasonable data security practices and notification measures, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly

---

[55] *See* Dixon & Emerson, *supra* note 44.

[56] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

increased risk to their PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Jacqueline Tapia's Experience*

99.     Plaintiff Jacqueline Tapia was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, she was required to provide her PII/PHI to Defendant.

100.     Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Tapia's PII/PHI in its system.

101.     Plaintiff Tapia is very careful about sharing her sensitive PII/PHI. Plaintiff Tapia stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Tapia would not have entrusted her PII/PHI to Defendant had she known of Defendant's lax data security policies.

102.     Upon information and belief, Plaintiff Tapia's PII/PHI was compromised in the Data Breach.

103.     As a result of the Data Breach, Plaintiff Tapia made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring her financial accounts for any unusual activity, which may take years to detect. Plaintiff Tapia has spent significant time dealing with the Data Breach—valuable time Plaintiff Tapia otherwise would have spent on other activities, including but not limited to work

and/or recreation. This time has been lost forever and cannot be recaptured.

104.    Following the Data Breach, Plaintiff Tapia experienced actual fraud in the form of a credit card opened in her name without authorization and charges for $432 and $1,030, both of which she has disputed with the credit card company. In addition, following the Data Breach, she has received notifications from commercially available credit monitoring products that her PII/PHI was found on the dark web.

105.    Plaintiff Tapia suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

106.    The Data Breach has caused Plaintiff Tapia to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

107.    As a result of the Data Breach, Plaintiff Tapia anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

108.    As a result of the Data Breach, Plaintiff Tapia is at a present risk and will continue

to be at increased risk of identity theft and fraud for her lifetime.

109.    Plaintiff Tapia has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Angela Alavez's Experience***

110.    Plaintiff Angela Alavez was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, she was required to provide her PII/PHI to Defendant.

111.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Alavez's PII/PHI in its system.

112.    Plaintiff Alavez is very careful about sharing her sensitive PII/PHI. Plaintiff Alavez stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Alavez would not have entrusted her PII/PHI to Defendant had she known of Defendant's lax data security policies.

113.    Upon information and belief, Plaintiff Alavez's PII/PHI was compromised in the Data Breach.

114.    As a result of the Data Breach, Plaintiff Alavez made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring her financial accounts for any unusual activity, which may take years to detect. Plaintiff Alavez has spent significant time dealing with the Data Breach—valuable time Plaintiff Alavez otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

115.    Following the Data Breach, Plaintiff Alavez experienced actual fraud in the form of an unauthorized charge on her credit card, causing her to cancel the card and get a new one reissued.

116.    Plaintiff Alavez suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

117.    The Data Breach has caused Plaintiff Alavez to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

118.    As a result of the Data Breach, Plaintiff Alavez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

119.    As a result of the Data Breach, Plaintiff Alavez is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

120.    Plaintiff Alavez has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded

from future breaches.

***Plaintiff Isabella Casanova's Experience***

121.    Plaintiff Isabella Casanova was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, she was required to provide her PII/PHI to Defendant.

122.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Casanova's PII/PHI in its system.

123.    Plaintiff Casanova is very careful about sharing her sensitive PII/PHI. Plaintiff Casanova stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Casanova would not have entrusted her PII/PHI to Defendant had she known of Defendant's lax data security policies.

124.    Upon information and belief, Plaintiff Casanova's PII/PHI was compromised in the Data Breach.

125.    As a result of the Data Breach, Plaintiff Casanova made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring her financial accounts for any unusual activity, which may take years to detect. Plaintiff Casanova has spent significant time dealing with the Data Breach—valuable time Plaintiff Casanova otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

126.    Plaintiff Casanova suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated

with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

127.    The Data Breach has caused Plaintiff Casanova to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

128.    As a result of the Data Breach, Plaintiff Casanova anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

129.    As a result of the Data Breach, Plaintiff Casanova is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

130.    Plaintiff Casanova has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Gregory Gardner's Experience***

131.    Plaintiff Gregory Gardner was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, he was required to provide his PII/PHI to Defendant.

132.    Upon information and belief, at the time of the Data Breach, Defendant maintained

Plaintiff Gardner's PII/PHI in its system.

133.   Plaintiff Gardner is very careful about sharing his sensitive PII/PHI. Plaintiff Gardner stores any documents containing his PII/PHI in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Gardner would not have entrusted his PII/PHI to Defendant had he known of Defendant's lax data security policies.

134.   Upon information and belief, Plaintiff Gardner's PII/PHI was compromised in the Data Breach.

135.   As a result of the Data Breach, Plaintiff Gardner made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring his financial accounts for any unusual activity, which may take years to detect. Plaintiff Gardner has spent significant time dealing with the Data Breach—valuable time Plaintiff Gardner otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

136.   Plaintiff Gardner suffered actual injury from having his PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to

undertake appropriate and adequate measures to protect the PII/PHI.

137.    The Data Breach has caused Plaintiff Gardner to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed his of key details about the Data Breach's occurrence.

138.    As a result of the Data Breach, Plaintiff Gardner anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

139.    As a result of the Data Breach, Plaintiff Gardner is at a present risk and will continue to be at increased risk of identity theft and fraud for his lifetime.

140.    Plaintiff Gardner has a continuing interest in ensuring that his PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Joan Visintainer's Experience***

141.    Plaintiff Joan Visintainer was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, she was required to provide her PII/PHI to Defendant.

142.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Visintainer's PII/PHI in its system.

143.    Plaintiff Visintainer is very careful about sharing her sensitive PII/PHI. Plaintiff Visintainer stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Visintainer would not have entrusted her PII/PHI to Defendant had she known of Defendant's lax data security policies.

144.    Upon information and belief, Plaintiff Visintainer's PII/PHI was compromised in the Data Breach.

145.    As a result of the Data Breach, Plaintiff Visintainer made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring her financial accounts for any unusual activity, which may take years to detect. Plaintiff Visintainer has spent significant time dealing with the Data Breach—valuable time Plaintiff Visintainer otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

146.    Following the Data Breach, Plaintiff Visintainer experienced actual fraud in the form of unauthorized charges on her debit card on two occasions first in December 2024 or January 2025 and the second in March or April 2025, causing her to cancel the debit card and get a new one reissued. In addition, following the Data Breach, she has received notifications from commercially available credit monitoring products that her PII/PHI was found on the dark web.

147.    Plaintiff Visintainer suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to

undertake appropriate and adequate measures to protect the PII/PHI.

148.    The Data Breach has caused Plaintiff Visintainer to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

149.    As a result of the Data Breach, Plaintiff Visintainer anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

150.    As a result of the Data Breach, Plaintiff Visintainer is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

151.    Plaintiff Visintainer has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Vincent Cipolla's Experience

152.    Plaintiff Vincent Cipolla was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, he was required to provide his PII/PHI to Defendant.

153.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Cipolla's PII/PHI in its system.

154.    Plaintiff Cipolla is very careful about sharing his sensitive PII/PHI. Plaintiff Cipolla stores any documents containing his PII/PHI in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Cipolla would not have entrusted his PII/PHI to Defendant had he known of Defendant's lax data security policies.

155.    Upon information and belief, Plaintiff Cipolla's PII/PHI was compromised in the Data Breach.

156.    As a result of the Data Breach, Plaintiff Cipolla made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring his financial accounts for any unusual activity, which may take years to detect. Plaintiff Cipolla has spent significant time dealing with the Data Breach—valuable time Plaintiff Cipolla otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

157.    Plaintiff Cipolla suffered actual injury from having his PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

158.    The Data Breach has caused Plaintiff Cipolla to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed his of key details about the Data Breach's occurrence.

159.    As a result of the Data Breach, Plaintiff Cipolla anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data

Breach.

160.    As a result of the Data Breach, Plaintiff Cipolla is at a present risk and will continue to be at increased risk of identity theft and fraud for his lifetime.

161.    Plaintiff Cipolla has a continuing interest in ensuring that his PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Raymond Pettus's Experience***

162.    Plaintiff Raymond Pettus was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, he was required to provide his PII/PHI to Defendant.

163.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Pettus's PII/PHI in its system.

164.    Plaintiff Pettus is very careful about sharing his sensitive PII/PHI. Plaintiff Pettus stores any documents containing his PII/PHI in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Pettus would not have entrusted his PII/PHI to Defendant had he known of Defendant's lax data security policies.

165.    Upon information and belief, Plaintiff Pettus's PII/PHI was compromised in the Data Breach.

166.    As a result of the Data Breach, Plaintiff Pettus made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring his financial accounts for any unusual activity, which may take years to detect. Plaintiff Pettus has spent significant time dealing with the Data Breach—valuable time

Plaintiff Pettus otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

167.    Following the Data Breach, Plaintiff Pettus has received notifications from Norton Security that his PII/PHI was found on the dark web.

168.    Plaintiff Pettus suffered actual injury from having his PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

169.    The Data Breach has caused Plaintiff Pettus to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed his of key details about the Data Breach's occurrence.

170.    As a result of the Data Breach, Plaintiff Pettus anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

171.    As a result of the Data Breach, Plaintiff Pettus is at a present risk and will continue to be at increased risk of identity theft and fraud for his lifetime.

172.    Plaintiff Pettus has a continuing interest in ensuring that his PII/PHI, which, upon

information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Kimberly Covington-Bernal's Experience***

173.    Plaintiff Kimberly Covington-Bernal was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, she was required to provide her PII/PHI to Defendant.

174.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Covington-Bernal's PII/PHI in its system.

175.    Plaintiff Covington-Bernal is very careful about sharing her sensitive PII/PHI. Plaintiff Covington-Bernal stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Covington-Bernal would not have entrusted her PII/PHI to Defendant had she known of Defendant's lax data security policies.

176.    Upon information and belief, Plaintiff Covington-Bernal's PII/PHI was compromised in the Data Breach.

177.    As a result of the Data Breach, Plaintiff Covington-Bernal made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring her financial accounts for any unusual activity, which may take years to detect. Plaintiff Covington-Bernal has spent significant time dealing with the Data Breach—valuable time Plaintiff Covington-Bernal otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

178.    Plaintiff Covington-Bernal suffered actual injury from having her PII/PHI

compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

179.    The Data Breach has caused Plaintiff Covington-Bernal to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

180.    As a result of the Data Breach, Plaintiff Covington-Bernal anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. She currently spends $29/monthly to Credit Karma as a result of the Data Breach.

181.    As a result of the Data Breach, Plaintiff Covington-Bernal is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

182.    Plaintiff Covington-Bernal has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Carolyn Presley's Experience***

183.    Plaintiff Carolyn Presley was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, she was required to provide her PII/PHI to

Defendant.

184.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Presley's PII/PHI in its system.

185.    Plaintiff Presley is very careful about sharing her sensitive PII/PHI. Plaintiff Presley stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Presley would not have entrusted her PII/PHI to Defendant had she known of Defendant's lax data security policies.

186.    Upon information and belief, Plaintiff Presley's PII/PHI was compromised in the Data Breach.

187.    As a result of the Data Breach, Plaintiff Presley made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring her financial accounts for any unusual activity, which may take years to detect. Plaintiff Presley has spent significant time dealing with the Data Breach—valuable time Plaintiff Presley otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

188.    Plaintiff Presley suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for

unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

189.    The Data Breach has caused Plaintiff Presley to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

190.    As a result of the Data Breach, Plaintiff Presley anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

191.    As a result of the Data Breach, Plaintiff Presley is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

192.    Plaintiff Presley has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Elise Bell's Experience***

193.    Plaintiff Elise Bell was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, she was required to provide her PII/PHI to Defendant.

194.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Bell's PII/PHI in its system.

195.    Plaintiff Bell is very careful about sharing her sensitive PII/PHI. Plaintiff Presley stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured

source. Plaintiff Presley would not have entrusted her PII/PHI to Defendant had she known of Defendant's lax data security policies.

196.    Upon information and belief, Plaintiff Bell's PII/PHI was compromised in the Data Breach.

197.    As a result of the Data Breach, Plaintiff Bell made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring her financial accounts for any unusual activity, which may take years to detect. Plaintiff Presley has spent significant time dealing with the Data Breach—valuable time Plaintiff Presley otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

198.    Plaintiff Bell suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

199.    The Data Breach has caused Plaintiff Bell to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

200.    As a result of the Data Breach, Plaintiff Bell anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

201.    As a result of the Data Breach, Plaintiff Bell is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

202.    Plaintiff Bell has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Heather Watkins's Experience***

203.    Plaintiff Heather Watkins was an Ascension patient prior to the Data Breach. As a condition of receiving medical care at Ascension, she was required to provide her PII/PHI to Defendant.

204.    Upon information and belief, at the time of the Data Breach, Defendant maintained Plaintiff Watkins's PII/PHI in its system.

205.    Plaintiff Watkins is very careful about sharing her sensitive PII/PHI. Plaintiff Watkins stores any documents containing her PII/PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the Internet or any other unsecured source. Plaintiff Watkins would not have entrusted her PII/PHI to Defendant had she known of Defendant's lax data security policies.

206.    Upon information and belief, Plaintiff Watkins's PII/PHI was compromised in the Data Breach.

207.    As a result of the Data Breach, Plaintiff Watkins made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as monitoring her financial accounts for any unusual activity, which may take years

to detect. Plaintiff Watkins has spent significant time dealing with the Data Breach—valuable time Plaintiff Watkins otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

208.    Plaintiff Watkins suffered actual injury from having her PII/PHI compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII/PHI; (iii) lost or diminished value of PII/PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII/PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI.

209.    The Data Breach has caused Plaintiff Watkins to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

210.    As a result of the Data Breach, Plaintiff Watkins anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

211.    Indeed, Plaintiff Watkins has already begun to see the substantial risk of identity theft and fraud start to come to fruition, as she recently experienced two fraudulent charges on her bank account that required her time to set straight in getting a new card, which then required her to update bill pay sites.

212.    Moreover, Plaintiff Watkins has experienced medical fraud in that medical care she never received showed up on her insurance—indicating that someone has procured medical care in her name.

213.    Further, she has received an increase in spam calls and texts.

214.    In response to the fraud and to mitigate the risk of additional fraud, Plaintiff Watkins has spent about 10 hours of her own time—a monetary injury of the value of her time.

215.    As a result of the Data Breach, Plaintiff Watkins is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

216.    Plaintiff Watkins has a continuing interest in ensuring that her PII/PHI, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

217.    This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

218.    Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

**Nationwide Class**
All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach that Defendant disclosed in or about April 2025 (the "Class").

219.    Excluded from the Class are Ascension Health and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

220.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claims.

221.    The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Ascension has reported that the Data Breach affected approximately 437,329 persons.[57]

222.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

   a.  Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

   b.  Whether Defendant had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

   c.  Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

   d.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

   e.  Whether Defendant breached its duties to protect Plaintiff's and Class members' PII/PHI; and

   f.  Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

223.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

224.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed

---

[57] *Cases Currently Under Investigation*, Dep't Health & Hum. Servs. (Apr. 28, 2025), https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf.

members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

225.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

226.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

227.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would

necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

228.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

229.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

230.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

231.    Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

232.    Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues

include, but are not limited to:

    a.   Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach;

    b.   Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.   Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d.   Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e.   Whether Defendant failed to take commercially reasonable steps to safeguard patient Private Information; and Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Class)**

233.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully set forth herein.

234.    Ascension owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

235.    Ascension knew or should have known the risks of collecting, storing, and sharing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems and procedures. Ascension knew or should have known of the many data breaches that targeted companies that collect and store PII/PHI in recent years.

236.    Given the nature of Ascension's business, the sensitivity and value of the PII/PHI it maintains and shares, and the resources at its disposal, Ascension should have identified the vulnerabilities to its systems and prevented the unauthorized disclosure of PII/PHI and the Data Breach from occurring.

237.    Ascension breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, and sharing PII/PHI with third parties who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it— including Plaintiff's and Class members' PII/PHI.

238.    It was reasonably foreseeable to Ascension that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, and sharing PII/PHI with third parties who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

239.    But for Ascension's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

240.    As a result of Ascension's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use

of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual

and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains

in Ascension's possession; (vi) future costs in terms of time, effort, and money that will be required

to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach;

and (vii) overpayment for the services that were received without adequate data security.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

241.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully

set forth herein.

242.    Ascension's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for

Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164,

Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of

Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C

(collectively, "HIPAA Privacy and Security Rules").

243.    Ascension's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C.

§ 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted by the FTC, the unfair act or practice by a business, such as Ascension, of failing to

employ reasonable measures to protect and secure PII/PHI.

244.    Ascension violated HIPAA Privacy and Security Rules and Section 5 of the FTCA

by failing to, and sharing PII/PHI with third parties who failed to, use reasonable measures to

protect Plaintiff's and other Class members' PII/PHI, by disclosing Plaintiff's and Class members'

PII/PHI to an unauthorized third party, by failing to provide timely notice, and by not complying

with applicable industry standards. Ascension's conduct was particularly unreasonable given the

nature and amount of PII/PHI it obtains, stores, and shares, and the foreseeable consequences of a

52

data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

245.    Ascension's violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

246.    Plaintiff and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

247.    The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

248.    It was, or should have been, reasonably foreseeable to Ascension that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, and sharing PII/PHI with third parties who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

249.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Ascension's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying

expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

### COUNT III
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiffs and the Class)

250.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully set forth herein.

251.    Plaintiff and Class members gave Ascension their PII/PHI in confidence, believing that Ascension would protect that information. Plaintiff and Class members would not have provided Ascension with this information had they known it would not be adequately protected. Ascension's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between Ascension and Plaintiff and Class members. In light of this relationship, Ascension must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

252.    Due to the nature of the relationship between Ascension and Plaintiff and Class members, Plaintiff and Class members were entirely reliant upon Ascension to ensure that their PII/PHI was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of Ascension's or its business associates' data security policies and practices, and Ascension was in an exclusive position to prevent unauthorized disclosures and guard against the Data Breach.

253.    Ascension has a fiduciary duty to act for the benefit of Plaintiff and Class members

upon matters within the scope of their relationship. It breached that duty by, *inter alia*, disclosing PII/PHI to unauthorized third parties, sharing PII/PHI with companies that failed to properly protect the integrity of the systems containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected and maintained.

254.    As a direct and proximate result of Ascension's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Ascension's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## <u>COUNT IV</u>
## BREACH OF EXPRESS CONTRACT
### (On Behalf of Plaintiffs and the Class)

255.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully set forth herein.

256.    Ascension's Notice of Privacy Practices is an agreement between Ascension and individuals who provided their PHI and PII to Ascension, including Plaintiffs and Class Members.

257.    Ascension represents that its Notice of Privacy Practices applies to information it collects about individuals who seek or receive Ascension's services.

258.    Ascension's Notice of Privacy Practices states that Ascension "We are committed

to maintaining the privacy and confidentiality of your health information."

259.    Ascension agrees to use the information for certain enumerated purposes including to: "to support our business, improve your care, educate our professionals, and evaluate provider performance," "with out business associates, who provide services for or on our behalf, such as a billing service, who help us with our business operations. All of our business associates are required to protect the privacy and security of your health information just as we do," "to notify you about possible alternative treatment options, new services, opportunities to participate in research, opportunities to provide us feedback on our services, and other health-related benefits or services," and "for Ascension fundraising purposes …."

260.    Ascension agrees to use the information for certain enumerated purposes only with written permission, including: "for marketing purposes," "for the sale of your information or for payments from third parties."

261.    None of the enumerated circumstances involve sharing Plaintiffs or the Class Members' PHI with unauthorized parties.

262.    Plaintiffs and Class Members on the one side and Ascension on the other formed a contract when Plaintiffs and Class Members obtained services from Ascension, or otherwise transmitted or authorized the transmission of PII and PHI to Ascension subject to its Notice of Privacy Practices.

263.    Ascension breached its agreement with Plaintiffs and Class Members by failing to protect their PII and PHI. Specifically, it (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) disclosed that information to unauthorized third parties, in violation of the agreement.

264.    As a direct and proximate result of Ascension's breach of contract, Plaintiffs and

Class Members sustained actual losses and damages as alleged herein, including that they did not receive the benefits of the bargains for which they paid. Plaintiffs and Class Members alternatively seek an award of nominal damages.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

265.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully set forth herein.

266.    In connection with receiving healthcare services, Plaintiff and all other Class members entered into implied contracts with Ascension.

267.    Pursuant to these implied contracts, Plaintiff and Class members paid money to Ascension, directly or through their insurance, and provided Ascension with their PII/PHI. In exchange, Ascension agreed to, among other things, and Plaintiff and Class members understood that Ascension would: (1) provide services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

268.    The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Ascension, on the other hand. Indeed, as set forth above, Ascension recognized the importance of data security and the privacy of its patients' PII/PHI in its Privacy Policy. Had Plaintiff and Class members known that Ascension would not adequately protect their PII/PHI, they would not have sought healthcare services from Ascension or agreed to provide it with their PII/PHI.

269.    Plaintiff and Class members performed their obligations under the implied contract when they provided Ascension with their PII/PHI and paid for healthcare services from Ascension.

57

270.    Ascension breached its obligations under its implied contracts with Plaintiff and Class members by failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, disclosing their PII/PHI to unauthorized third parties, sharing their PII/PHI with third parties who failed to implement and maintain security protocols and procedures to protect PII/PHI, and failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

271.    Ascension's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the unauthorized disclosure of their PII/PHI and the Data Breach, and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

272.    Plaintiff and all other Class members were damaged by Ascension's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and incurred money to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they overpaid for services that were received without adequate data security.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

273.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully

set forth herein.

274.    This claim is pleaded in the alternative to the breach of implied contract claim.

275.    Plaintiff and Class members conferred a monetary benefit upon Ascension in the form of monies paid to Ascension for healthcare services and through the provision of their PII/PHI.

276.    Ascension accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Ascension benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was necessary to facilitate Ascension's healthcare operations and billing services.

277.    As a result of Ascension's conduct, Plaintiff and Class members suffered actual, measurable damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures, that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures, that they received.

278.    Ascension should not be permitted to retain the money belonging to Plaintiff and Class members because Ascension failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

279.    Plaintiff and Class members have no adequate remedy at law.

280.    Ascension should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT VII**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Class)**

281.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully

set forth herein.

282.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

283.    Defendant owed a duty to its current and former clients, including Plaintiffs and the Class, to keep this information confidential.

284.    Defendants' conduct as set forth in the foregoing paragraphs, specifically wrongfully disclosing its patients' PII/PHI to a former partner and then to cybercriminals, constitutes both intrusion upon seclusion and a public disclosure of private facts and is highly offensive to a reasonable person.

285.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

286.    The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

287.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

288.    Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

289.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

290.    As a proximate result of Defendants' acts and omissions, the private and sensitive PII/PHI of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed supra).

291.    And, on information and belief, Plaintiffs' PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

292.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII/PHI are still maintained by Defendant with its inadequate cybersecurity practices and policies.

293.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiffs and the Class.

294.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs

<u>COUNT VIII</u>
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**Mo. Rev. Stat. § 407.010 et seq.**
**(On Behalf of Plaintiffs and the Class)**

295.    Plaintiffs reallege and incorporate by reference all preceding allegations as if fully

set forth herein.

296.    The Missouri Merchandising Practice Act (the "MMPA") prohibits false, fraudulent, or deceptive merchandising practices to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.

297.    The MMPA prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.

298.    The MMPA defines "Merchandise" as "any objects, wares, goods, commodities, intangibles, real estate or services." Mo. Rev. Stat. § 407.010(4).

299.    Plaintiffs, individually and on behalf of the Class, are entitled to bring an action pursuant to Mo. Rev. Stat. § 407.025, which provides in relevant part that: (a) Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.20, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award the prevailing party attorneys' fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper. Mo. Rev. Stat. § 407.025.

300.    Defendant is a "person" within the meaning of the MMPA in that Defendant is a domestic, for-profit corporation. Mo. Rev. Stat. § 407.010(5).

301.    Plaintiff and Class Members are "persons" under the MMPA because they are

natural persons and they used Defendant's services for personal, family, and/or household use.

302.    The Missouri Attorney General has specified the settled meanings of certain terms used in the enforcement of the MMPA. Specifically, Mo. Code Regs. tit. 15, § 60-8.020, provides:

(1)    Unfair practice is any practice which—

    (A)    Either—

        1.    Offends any public policy as it has been established by the Constitution, statutes, or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

        2.    Is unethical, oppressive, or unscrupulous; and

    (B)    Presents a risk of, or causes, substantial injury to consumers.

303.    Proof of deception, fraud, or misrepresentation is not required to prove unfair practices as used in section 407.020.1., RSMo. (See *Federal Trade Commission v. Sperry and Hutchinson Co.*, 405 U.S. 233 (1972); *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (N.C. 1981); see also, Restatement, Second, Contracts, sections 364 and 365.

304.    Pursuant to the MMPA and Mo. Code Regs. Tit. 15, § 60- 8.020, Defendant's acts and omissions fall within the meaning of "unfair."

305.    Defendants engaged in a "trade" or "commerce" within the meaning of the MMPA with regard to services which are supposed to keep Plaintiff's and the Class Members's Private Information safe and secure.

306.    Defendant engaged in unlawful practices and deceptive conduct, which emanated from its Missouri headquarters, in violation of the MMPA by omitting and/or concealing material facts related to the safety and security of Plaintiff's and the Class Members's Private Information. Defendant's unfair and unethical conduct of failing to secure Private Information and failing to

disclose the Data Breach caused substantial injury to consumers in that the type of consumers' personal information impacted by the breach can be used to orchestrate a host of fraudulent activities, including medical, insurance, and financial fraud and identity theft. The impacted consumers have been placed in an immediate and continuing risk of harm from fraud, identity theft, and related harm caused by the Data Breach.

307.    Defendant's conduct of failing to secure data required Plaintiff and the Class to undertake time-consuming, and often costly, efforts to mitigate the actual and potential harm caused by the Data Breach's exposure of their Private Information.

308.    Defendant's conduct of concealing, suppressing, or otherwise omitting material facts regarding the Data Breach was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the MMPA.

309.    By failing to secure sensitive data and failing to disclose and inform Plaintiff and Class Members about the Breach of Private Information, Defendant engaged in acts and practices that constitute unlawful practices in violation of the MMPA. Mo. Ann. Stat. §§ 407.010, et seq.

310.    Defendant engaged in unlawful practices and deceptive conduct in the course of their business that violated the MMPA including misrepresentations and omissions related to the safety and security of Plaintiff's and the Class's Private Information. Mo. Rev. Stat. § 407.020.1.

311.    As a direct and proximate result of these unfair and deceptive practices, Plaintiff and each Class member suffered actual harm in the form of money and/or property because the disclosure of their Private Information has value encompassing financial data and tangible money.

312.    Defendant's "unfair" acts and practices include:

   a.    by utilizing cheaper, ineffective security measures and diverting those funds to its

own profit, instead of providing a reasonable level of security that would have prevented the hacking incident;

b. failing to follow industry standard and the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data;

c. failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages;

d. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' personal information; and

e. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45 and HIPAA.

313.    Defendant's unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' personal information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45 and HIPAA, which was a direct and

proximate cause of the Data Breach;

> d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' personal information, including by implementing and maintaining reasonable security measures; and

> e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45 and HIPAA.

314. Defendant's misrepresentations and omissions were material to consumers and made to induce consumers' reliance regarding the safety and security of Private Information to obtain consumers' Private Information and purchase of medical products and/or services.

315. Defendant's deceptive practices misled Plaintiff and the Class and would cause a reasonable person to enter into transactions with Defendant that resulted in damages.

316. As such, Plaintiff and the Class seek: (1) to recover actual damages sustained; (2) to recover punitive damages; (3) to recover reasonable attorneys' fees and costs; and (4) such equity relief as the Court deems necessary or proper to protect Plaintiff and the members of the Class from Defendant's deceptive conduct and any other statutorily available damages or relief the court deems proper.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual

damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: September 26, 2025                    Respectfully submitted,

                                            */s/ Jack Garvey*
                                            John F. Garvey #35879(MO)
                                            Colleen Garvey #72809(MO)
                                            Ellen A. Thomas #73043(MO)
                                            **STRANCH, JENNINGS & GARVEY, PLLC**
                                            Peabody Plaza
                                            701 Market Street, Suite
                                            St. Louis, MO 63101
                                            Tel: (314) 390-6750
                                            jgarvey@stranchlaw.com
                                            cgarvey@stranchlaw.com
                                            ethomas@stranchlaw.com

                                            J. Gerard Stranch, IV
                                            Grayson Wells #73068(MO)

**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Jeff Ostrow (*Pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
1 W. Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 332-4200
ostrow@kolawyers.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

Lynn A. Toops*
Amina A. Thomas*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204

Tel: (317) 636-6481
ltoops@cohenmalad.com
athomas@cohenmalad.com

William B. Federman*
Tanner R. Hilton*
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
4131 North Central Expressway, Suite 900
Dallas, TX 75204
Tel: (405) 235-1560
wbf@federmanlaw.com
trh@federmanlaw.com

James J. Rosemergy #111477
**CAREY, DANIS & LOWE**
8235 Forsyth, Suite 1100
St. Louis, MO 63105
Tel: (314) 725-7700
jrosemergy@careydanis.com

Paul J. Doolittle*
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Tel: (803) 222-2222
Email: cmad@poulinwilley.com

*Counsel for Plaintiffs and the Proposed Class*

*\*Pro hac vice* application forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of September, 2025, I filed the foregoing Consolidated Class Action Complaint using the Court's CM/ECF system, which will serve on all counsel of record.

/s/ Jack Garvey
Jack Garvey #35879(MO)
